DANIEL C. GIRARD (SBN: 114826)
DENA C. SHARP (SBN: 245869)
SCOTT M. GRZENCZYK (SBN: 279309)
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846
Email: dcg@girardgibbs.com
Email: chc@girardgibbs.com
Email: smg@girardgibbs.com

*Counsel for Plaintiff United Food and*
*Commercial Workers Local 1776 &*
*Participating Employers Health and Welfare Fund*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1776 & PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND, on behalf of itself and all others similarly situated,<br><br>       Plaintiff,<br><br>  v.<br><br>TEIKOKU PHARMA USA, INC., TEIKOKU SEIYAKU CO., LTD., ENDO PHARMACEUTICALS INC., WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., and ACTAVIS plc.,<br><br>      Defendants. | Case No: 5:13-cv-5257<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff, United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund ("Plaintiff" or "UFCW"), on behalf of itself and all others similarly situated, for its Complaint against Defendants Endo Pharmaceuticals Inc. ("Endo"), Teikoku Pharma USA ("Teikoku Pharma"), Teikoku Seiyaku Co., Ltd. ("Teikoku Seiyaku" and together with Teikoku Pharma "Teikoku" and collectively with Endo, "Endo/Teikoku"), Watson Pharmaceuticals, Inc., and Actavis plc, f/k/a Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc. (collectively, "Watson") (together with Endo/Teikoku, the "Defendants") alleges as follows based on: (a) personal knowledge; (b) the investigation of its counsel; and (c) information and belief.

# I.   NATURE OF THE ACTION

1.     This is a civil antitrust action brought by Plaintiff on behalf of a proposed class of end-payors who indirectly purchased, reimbursed or otherwise paid for lidocaine patch 5%, sold by Endo under the brand name Lidoderm.  Lidoderm is a lidocaine-containing pain patch for the treatment of pain associated with post-herpetic neuralgia.  Plaintiff seeks overcharge damages arising out of Endo/Teikoku's overarching anticompetitive scheme that illegally delayed the availability of less expensive generic versions of Lidoderm, an order enjoining Defendants' anticompetitive conduct, and other relief.

2.      The scheme included:  (a) causing and/or maintaining the improper listing of U.S. Patent No. 5,827,529 (the "'529 patent"), which does not cover Lidoderm, in the book of Approved Drug Products with Therapeutic Equivalence Evaluations, commonly referred to as the "Orange Book"; (b) commencing and maintaining baseless litigation against generic manufacturers; and (c) entering into an unlawful agreement with Watson not to compete in the market for lidocaine patch 5%.

3.     First, Teikoku wrongfully listed and/or maintained the listing of the '529 patent in the Orange Book as related to Lidoderm.  Teikoku knew by at least 2003 that the '529 patent did not actually claim Lidoderm or a method of using Lidoderm.  By listing and maintaining the '529 patent in the Orange Book, Teikoku knew that it would force any generic company seeking

approval to market generic lidocaine patch 5% before the patent expired to file a certification with the Food and Drug Administration ("FDA") that the patent was invalid or would not be infringed.  Teikoku knew and intended that such a filing would trigger Endo and Teikoku's ability to file infringement litigation, which in turn would trigger an automatic Hatch-Waxman statutory delay of 30 months for approval of any such generic's abbreviated new drug application ("ANDA") by FDA.

4.      Second, when Watson submitted an application to FDA for approval to market a generic version of Lidoderm, Endo and Teikoku commenced baseless patent infringement litigation against Watson.  The litigation was objectively baseless because no reasonable litigant would have realistically expected success on the merits.  Endo and Teikoku commenced and maintained the litigation solely to delay approval of generic versions of Lidoderm.

5.      Third, in furtherance of, and as part of, the anticompetitive scheme, Endo and Teikoku entered into a non-competition agreement with Watson, agreeing to pay Watson substantial sums in exchange for Watson's agreement to delay marketing its less expensive generic version of Lidoderm for over a year, *i.e.*, until September 15, 2013 (the "Agreement").  Watson thereby joined the anticompetitive scheme as a co-conspirator.  Watson did, in fact, delay marketing its less-expensive generic version of Lidoderm.

6.      Finally, as part of the Agreement, Endo and Teikoku promised not to launch an authorized generic to compete with Watson's generic Lidoderm for 7.5 months after Watson launches its generic.

7.      But for Defendants' anticompetitive scheme, in whole or in part, one or more generic versions of Lidoderm would have been marketed in the United States as early as May 2012.  Thus, absent Defendants' anticompetitive scheme, in whole or in part, Plaintiff and the members of the Class would have already been able to satisfy their lidocaine patch 5% requirements at significantly lower prices, rather than being forced to pay for branded Lidoderm at higher prices because of the illegal scheme.  Lidoderm sales for the twelve months ending March 31, 2012 were approximately $1.2 billion.

8.      Defendants' anticompetitive scheme was designed to and did in fact: (a) delay and/or preclude the entry of less expensive generic versions of lidocaine patch 5% in the United States; (b) delay the introduction of an authorized generic lidocaine patch 5%, which otherwise would have appeared on the market at a significantly earlier time; (c) fix, raise, maintain or stabilize the prices of lidocaine patch 5% products; (d) permit Endo/Teikoku to maintain a monopoly in the United States for lidocaine patch 5%; and (e) allocate 100% of the United States lidocaine patch 5% market to Endo/Teikoku.

9.      As alleged in more detail below, Defendants violated § 1 and § 2 of the Sherman Act and the state laws enumerated below through their anticompetitive scheme to improperly maintain and extend their market and monopoly power by foreclosing or delaying competition from lower-priced generic versions of lidocaine patch 5%.

II.   **JURISDICTION AND VENUE**

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than one hundred members of the Class, and at least one member of the putative Class is a citizen of a state different from that of one of the Defendants.

11.      This Court also has jurisdiction over this matter pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 in that Plaintiff brings claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy Defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2. The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

12.      Venue is proper in this Court under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because Defendants transact business in this District. A substantial part of the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried on in part within this District. The acts complained of have and will continue to have substantial effects in this District.

3

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

III.    **INTRADISTRICT ASSIGNMENT**

13.    Assignment to any division in this District is proper because the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried out within each division.  Defendant Teikoku Pharma has its principal place of business in the San Jose division.

IV.    **PARTIES**

A.    **Plaintiff**

14.    Plaintiff UFCW maintains its principal place of business at 3031-A Walton Road, Plymouth Meeting, Pennsylvania 19462.  Plaintiff has purchased and/or provided reimbursement for some or all of the purchase price of Lidoderm, other than for re-sale, at supra-competitive prices during the Class Period, and has thereby been injured.

B.    **Defendants**

15.    Defendant Endo Pharmaceuticals Inc. is a Delaware corporation, having its principal place of business in at 100 Endo Boulevard, Chadds Ford, Pennsylvania.  Endo markets and sells Lidoderm throughout the United States.

16.    Defendant Teikoku Seiyaku is a company organized and existing under the laws of Japan, having its principal place of business in Higashikagawa, Kagawa, Japan.  Teikoku Seiyaku is the owner, assignee or licensee of the '529 patent over which Endo and Teikoku sued Watson.  Teikoku Seiyaku manufactures Lidoderm in Japan for commercial sale in the United States by Endo under a Manufacturing and Supply Agreement with Endo.  Endo pays Teikoku Seyaku royalties under that agreement.

17.    Defendant Teikoku Pharma is a California corporation, having its principal place of business at 1718 Ringwood Avenue, San Jose, California.  Teikoku Pharma is a wholly-owned subsidiary of Teikoku Seiyaku, and is the holder of the New Drug Application for Lidoderm.

18.    Actavis plc is incorporated under the laws of Ireland, with principal place of business at 1 Grand Canal Square, Docklands Dublin 2, Ireland and a place of business in Morris Corporate Center III 400 Interpace Parkway Parsippany, NJ 07054.  Watson Pharmaceuticals, Inc. changed its name to

4

1   Actavis, Inc. as a result of Watson Pharmaceuticals, Inc.'s acquisition of Swiss-based Actavis Group on

2   or around October 2012.  On or about October 1, 2013, Actavis Inc. changed its name to Actavis plc.

3       19.     Defendant Watson Pharmaceuticals, Inc. was a Nevada corporation, having its principal

4   place of business at 311 Bonnie Circle, Corona, California.  Effective on or about January 24, 2013,

5   Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc., which later became Actavis plc.

6       20.     Defendant Watson Laboratories, Inc. was a Nevada corporation, having its principal

7   place of business at 311 Bonnie Circle, Corona, California. Defendant Watson Laboratories, Inc. was a

8   wholly-owned subsidiary of Watson Pharmaceuticals, Inc.

9       21.     Actavis plc, Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc. are collectively

10  referred to herein as "Watson."   Watson is engaged in the worldwide marketing, production and

11  distribution of generic pharmaceutical products, including in this judicial district.

12      22.     All of Defendants' actions described in this complaint are part of, and in furtherance of,

13  the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' various

14  officers, agents, employees, or other representatives while actively engaged in the management of

15  Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties

16  and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

17      23.     With respect to all of the conduct complained of below, at all relevant times Endo acted

18  in concert with the Teikoku Defendants.

19  **V.     CLASS ACTION ALLEGATIONS**

20      24.     Plaintiff brings this action on behalf of itself and, under Rule 23(a), (b)(2) and (b)(3) of

21  the Federal Rules of Civil Procedure, as representative of a Class defined as follows:

22
23      All persons or entities in the United States and the District of Columbia and Puerto Rico
        who purchased and/or paid for some or all of the purchase price for branded and/or
        generic Lidoderm, in any form, for consumption by themselves, their families, or their
24      members, employees, insureds, participants, or beneficiaries (the "Class" or the "End-
        Payor Class"), other than for resale at any time during the period May 2, 2012, through
25      the date the anticompetitive effects of Defendants' challenged conduct cease (the "Class
        Period").
26

27                              5

28

25.     The following persons or entities are excluded from the proposed End-Payor Class:

a.   Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

b.   All governmental entities, except for governmental funded employee benefit plans;

c.   All persons or entities who purchased Lidoderm or its AB-rated generic equivalent for purposes of resale or directly from Defendants or their affiliates;

d.   Fully insured health plans, *i.e.*, plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members;

e.   Any "flat co-pay" consumers whose purchases were paid in part by a third- party payor and whose co-payment was the same regardless of the retail purchase price; and

f.   The judges in this case and any members of their immediate families.

26.     Members of the Class are so numerous that joinder is impracticable.  Plaintiff believes the Class includes hundreds of thousands, if not millions, of consumers and thousands of third-party payors.

27.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they paid artificially inflated prices for lidocaine patch 5% and were deprived of the benefits of competition from less-expensive generic versions of Lidoderm as a result of Defendants' wrongful conduct.

28.     Plaintiff will fairly and adequately protect and represent the interests of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

29.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, and have particular experience with class action antitrust litigation in the pharmaceutical industry.

30.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

31.     Questions of law and fact common to the Class include:

a.      whether Teikoku improperly listed and/or maintained the listing of the '529 Patent in the Orange Book;

b.      whether Endo and Teikoku's patent infringement litigation against Watson was objectively baseless;

c.      whether Endo and Teikoku engaged in sham litigation to prevent competition;

d.      whether Defendants conspired to suppress generic competition to Lidoderm;

e.      whether, pursuant to the Agreement, Watson agreed to delay its entry into the market with generic Lidoderm;

f.      whether, pursuant to the Agreement, Endo and Teikoku compensated Watson;

g.      whether Defendants' challenged conduct suppressed generic competition to Lidoderm;

h.      whether Defendants' challenged conduct harmed competition in the market(s) in which Lidoderm is sold;

i.      whether Endo possessed market or monopoly power over Lidoderm;

j.      to the extent a relevant market or markets must be defined, what that definition is or those definitions are;

k.      whether the activities of Defendants as alleged herein have substantially affected interstate and/or intrastate commerce;

l.      whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of Plaintiff and the members of the Class in the nature of overcharges; and

m.      the quantum of overcharges paid by the Class in the aggregate.

32.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

7

33.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.     REGULATORY BACKGROUND

### A.     The Regulatory Structure for Approval of Generic Drugs

34.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), a manufacturer who creates a new drug product must obtain the approval of FDA to sell the new drug by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as information on applicable patents. 21 U.S.C. § 355(a), (b).

35.     NDAs that meet certain requirements are eligible for exclusivities that prevent FDA from approving applications for the same drug for prescribed periods of time. One example is Orphan Drug Exclusivity, which is available for drugs that treat rare diseases or disorders. This exclusivity prohibits FDA approval of other applications for the same drug for seven years. 21 C.F.R. § 316.31.

36.     When FDA approves a brand manufacturer's NDA, the brand manufacturer may list in the Orange Book any patent that claims either the approved drug or approved methods of use of the drug and could reasonably be asserted against a generic manufacturer who makes, uses, or sells a generic version of the brand drug prior to the expiration of the listed patent(s). Patents issued after NDA approval may be listed in the Orange Book within thirty days of issuance. 21 U.S.C. §§ 355(b)(1) & (c)(2).

37.     The FDA relies completely on the brand manufacturer's truthfulness about patent validity and applicability, as it does not have the resources or authority to verify the manufacturer's patents for accuracy or trustworthiness. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

### 1.     The Hatch-Waxman Amendments

38.     The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.

8

1  *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

2  A generic manufacturer seeking approval to sell a generic version of a brand drug may instead file an

3  ANDA.  An ANDA relies on the scientific findings of safety and effectiveness included in the brand

4  manufacturer's original NDA, and must show that the generic drug contains the same active

5  ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the

6  same rate and to the same extent as the brand drug—that is, that the generic drug is pharmaceutically

7  equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug.

8        39.    The FDCA and Hatch-Waxman Amendments operate on the presumption that

9  bioequivalent drug products containing identical amounts of the same active ingredients, having the

10  same route of administration and dosage form, and meeting applicable standards of strength, quality,

11  purity and identity, are therapeutically equivalent and may be substituted for one another.

12  Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in

13  the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21

14  U.S.C. § 355(j)(8)(B).

15        40.    Congress enacted the Hatch-Waxman Amendments to expedite the entry of legitimate

16  (non-infringing) generic competitors, thereby reducing healthcare expenses nationwide.  Congress also

17  sought to protect pharmaceutical companies' incentives to create new and innovative products.

18                  **2.**    **Paragraph IV Certifications**

19        41.    To obtain FDA approval of an ANDA, a generic manufacturer must certify that the

20  generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book.  Under the

21  Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

22        a.    that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

23

24        b.    that the patent for the brand drug has expired (a "Paragraph II certification");

25        c.    that the patent for the brand drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III certification"); or

26

27

28

9

1

2

      d.     that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

3

4

42.    If a generic manufacturer files a Paragraph IV certification, a brand manufacturer has the ability to delay FDA approval of its ANDA simply by suing the ANDA applicant for patent infringement.  If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of thirty months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.  Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to go to market with its product.  FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay.

43.    As an incentive to spur generic companies to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV certification typically gets a period of protection from competition from other generic versions of the drug.  The first generic applicant receives 180 days of market exclusivity (unless some forfeiture event, like that discussed below, occurs).  This means that the first approved generic is the only available generic for at least six months.  However, the brand company can, and often does, sell, or license for sale, an authorized generic to compete with the first approved generic during the six month exclusivity period. This has become common practice in the industry.

44.    Although not intended to do so, FDA regulations provide incentives for brand manufacturers to "game the system" by (a) listing patents in the Orange Book, even if such patents are not eligible for listing; and (b) suing any generic competitor that files an ANDA with a Paragraph IV certification, even if the competitor's product does not actually infringe the listed patent(s) and/or the

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

1  patents are invalid or unenforceable, in order to delay final FDA approval of an ANDA for up to 30

2  months.

3      45.    The first generic applicant can help the brand manufacturer "game the system" by

4  delaying not only its own market entry, but also the market entry of all other generic manufacturers.

5  The first generic applicant, by agreeing not to begin marketing its generic drug, thereby delays the start

6  of the 180-day period of generic market exclusivity, a tactic called exclusivity "parking."  This tactic

7  creates a "bottleneck," because later generic applicants cannot launch until the first generic applicant's

8  180-day exclusivity has elapsed or is forfeited.

9                  **3.    Forfeiture Provisions Under the MMA**

10     46.    On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement,

11 and Modernization Act of 2003 ("MMA") in an attempt to make it more difficult for brand and generic

12 pharmaceutical companies to conspire to delay the start of the first-filer's 180-day period of generic

13 market exclusivity.  The MMA outlines a number of conditions under which an ANDA applicant forfeits

14 its eligibility for 180-day exclusivity, making way for other ANDA filers to launch their products.

15     47.    Under the "failure to market" provision, a first ANDA applicant will forfeit its 180-day

16 exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is (i) 75 days

17 after receiving final FDA approval; or (ii) 30 months after the date it submitted its ANDA; or (b) the

18 date that is 75 days after the date as of which, as to each of the patents that qualified the first applicant

19 for exclusivity (*i.e.*, as to each patent for which the first applicant submitted a Paragraph IV

20 certification), at least one of the following has occurred: (i) a final decision of invalidity or non-

21 infringement; (ii) a settlement order entering final judgment that includes a finding that the patent is

22 invalid or not infringed; or (iii) the NDA holder delists the patent from the Orange Book.

23     48.    Brand manufacturers and first-filing generics are able to structure their settlements in

24 order to intentionally skirt the failure-to-market provisions and keep the 180-day exclusivity bottleneck

25 in place by, for example, settling their litigation before a final judgment of invalidity or non-

26 infringement can be entered with respect to each of the patents for which the first applicant submitted a

27

28

11

1  Paragraph IV certification, or seeking a consent judgment settling the litigation that does not include a

2  finding that all of the patents for which the first applicant submitted a Paragraph IV certification were

3  invalid or not infringed.  When that happens, in order to trigger a forfeiture and gain access to the

4  market, subsequent ANDA applicants are forced to obtain a judgment that all patents for which the first

5  filing generic company filed Paragraph IV certifications are invalid or not infringed.

6  **4.    Citizen Petitions to FDA**

7      49.    Federal regulations governing FDA create a mechanism by which a person may file a

8  petition with the FDA requesting, among other things, that the agency take, or refrain from taking, any

9  form of administrative action.  This mechanism is commonly referred to as a citizen petition. 21 C.F.R.

10 § 10.30.

11     50.    The citizen petition process is intended to provide an opportunity for persons to express

12 genuine concerns about the safety or efficacy of product any time before or after its market entry.

13     51.    The person submitting a citizen petition is required under FDA regulations to include all

14 information and views on which the petitioner relies, as well as all information and data known to the

15 petitioner which is unfavorable to the petition.

16     52.    The FDA regulations concerning citizen petitions in effect at the relevant time required

17 the FDA Commissioner to respond to each citizen petition within 180 days of receipt.  That response

18 may have been to approve the request in whole or in part, deny the request, or provide a tentative

19 response with an estimate on a time for a full response.

20     53.    Reviewing and responding to citizen petitions is often a resource-intensive and time

21 consuming task, regardless of the merits of the petition, because FDA must research the petition's

22 subject matter, examine scientific, medical, legal and sometimes economic issues, consider public

23 response to the petition and coordinate internal agency review and clearance of the petition response.

24 These activities strain FDA's limited resources.

25     54.    During the time period in which the citizen petition at issue in this case was submitted, it

26 was the practice of FDA, well known in the pharmaceutical industry, to withhold both tentative and final

27

28

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

1    ANDA approval until after its consideration of and response to a citizen petition was complete.  On this

2    subject, Gary Buehler, RPh, Acting Director of the Office of Generic Drugs in the Center for Drug

3    Evaluation and Research (CDER), acknowledged that, "[i]t is very rare that petitions present new issues

4    that CDER has not fully considered, but the Agency must nevertheless assure itself of that fact by

5    reviewing the citizen petitions."

6         55.    The citizen petition process has been subject to misuse and abuse by many brand

7    manufacturers as a tactic to extend their monopolies on certain brand drugs.  Often citizen petitions by

8    brand companies seeking to delay approval of generic ANDAs fail to raise legitimate concerns about the

9    safety or efficacy of generic products, but instead seek to preserve monopolies after the end of a

10   statutorily-granted patent or FDA exclusivity period.  Final approval of a pending ANDA is often

11   delayed for several months, or even years, while FDA evaluates the citizen petition.

12        56.    The resulting delay of generic competition is a lucrative outcome for an incumbent brand

13   manufacturer facing impending competition from generic equivalents.  The cost of filing or amending a

14   citizen petition is trivial compared to the value of securing an additional period of monopoly profits.

15   **B.    Generic Versions of Brand Drugs are Significantly Less Expensive, and Take
          Significant Sales Directly From the Corresponding Brand Versions**

16

17        57.    Typically, AB-rated generics are priced significantly below their branded counterparts.

18   Because of the price differentials, and other institutional features of the pharmaceutical industry, generic

19   versions are liberally and substantially substituted by pharmacists when presented with a prescription for

20   the brand counterpart.  In particular, generic drugs that are therapeutically equivalent to their brand

21   counterparts are given an "AB" rating by FDA.  In every state, pharmacists are permitted (and, in some

22   states, required) to substitute a generically-equivalent product for the brand product prescribed, unless

23   the doctor has indicated that the prescription for the brand product must be "dispensed as written."  As

24   more generic manufacturers enter the market, prices for generic versions of a drug predictably decrease

25   even further because of competition among the generic manufacturers.  Pharmacy substitution, and thus

26   the loss of sales volume by the brand drug to the corresponding generic, thereby accelerates.

27

28

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

58.     Generic competition enables all members of the proposed Class to: (a) purchase generic versions of the drug at substantially lower prices; and/or (b) purchase the brand drug at a reduced price. However, until a generic manufacturer enters the market, there is no bioequivalent generic drug to substitute for and otherwise compete with the brand drug, and therefore the brand manufacturer can continue to charge supracompetitive prices profitably without losing all or a substantial portion of its brand sales.  Consequently, brand manufacturers have a strong incentive to use various tactics, including those alleged above and below, to delay the introduction of generic competition into the market

## VII.   FACTUAL ALLEGATIONS

### A.   Background

#### 1.     Approval of Brand Lidoderm and the Relevant Patents

59.     Lidoderm is a prescription lidocaine-containing (5%) pain patch used to treat pain associated with post-herpetic neuralgia.   The active ingredient in Lidoderm is lidocaine.   Its pharmacological profile, and thus its side effect and efficacy profile, is different from other pharmaceuticals that are used to treat the same or similar conditions.  Those other drugs are not AB-rated to Lidoderm, cannot be automatically substituted for Lidoderm by pharmacists, do not exhibit substantial cross-price elasticity of demand with respect to Lidoderm, and thus are not economic substitutes for, nor reasonably interchangeable with, Lidoderm.

60.     On March 19, 1999, FDA approved NDA 21-153, submitted by Hind Health Care, Inc. ("Hind"), which sought to market an adhesive patch containing 5% lidocaine under the brand name Lidoderm for the treatment of pain associated with post-herpetic neuralgia.  Lidoderm was awarded Orphan Drug Exclusivity by FDA, meaning that no generic competitor could get FDA approval for generic Lidoderm until March 2006.

61.      In 1998, Hind had granted to Endo the exclusive right to market and distribute Lidoderm in the United States.   Hind subsequently transferred full ownership of and responsibility for the Lidoderm NDA to Teikoku Pharma, effective June 1, 1999.  Endo launched Lidoderm in the United States in 1999.

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

62.     Endo and Teikoku owned or obtained assignments of or licenses to a number of patents associated with Lidoderm.

63.     Subsequently, Teikoku listed several patents in the Orange Book as covering Lidoderm. As of January 2010, when Watson filed ANDA No. 20-675, which was the first filed ANDA as to Lidoderm, Teikoku had three patents listed in the Orange Book:   The first was U.S. Patent No. 5,411,738 (the "'738 patent"), which is a method of use patent for treating certain types of pain with lidocaine using a topical delivery mechanism and a gel formulation of lidocaine.   The second was U.S. Patent No. 5,601,838 ("the '838 patent"), which is a method of use patent for treating certain types of pain with lidocaine.   The '738 and '838 patents both were assigned to Hind, both expired on May 2, 2012, and are referred to collectively as the "Hind patents."   The third was the '529 patent, which is a formulation patent for a lidocaine patch.   This patent was assigned to Teikoku, and is set to expire on October 17, 2015.   Watson did not challenge the Hind patents.   As a result, FDA could not approve Watson's ANDA for generic Lidoderm until the Hind patents expired on May 2, 2012.

64.     Endo subsequently obtained additional patents from LecTec Corporation ("LecTec") that it and Teikoku claim cover Lidoderm.   In July 2008, LecTec had filed patent infringement litigation against Endo and other manufacturers of medicinal patch products in the United States District Court for the Eastern District of Texas (the "LecTec Litigation") over U.S. Patent No. 5,536,263 (the "'263 patent"), and U.S. Patent No. 5,741,510 (the "'510 patent"), both of which are patents for a medicinal adhesive patch.   Each of these patents expires on March 30, 2014.

65.     Endo settled the litigation in November 2009 with LecTec by paying LecTec $23 million in exchange for exclusive licenses to the '263 and the '510 patents for use in the field of prescription pain medications and treatment.[1]

---

[1] http://www.lectec.com/wp-content/uploads/2010/01/Settle-Patent-Dispute_11Nov2009.pdf

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

66.     Almost a year later, in or about October 2010, Endo granted Teikoku a sublicense under the '510 patent to make and sell prescription pain medications that contain 5% lidocaine in patch dosage form, including Lidoderm.

67.     In or about November 2010, Teikoku submitted the '510 patent to the FDA for listing in the Orange Book with respect to Lidoderm.

68.     As of January 2011, Endo/Teikoku had four patents listed in the Orange Book related to Lidoderm:  the two Hind patents,  the '529 patent, and the '510 patent.

69.     In or about May 2011, in exchange for $2 million, Endo acquired from LecTec full title to the '263 patent, the '510 patent and three other patents.  The three other patents were: U.S. Patent No. 6,096,333 (the "'333 patent"); (ii) U.S. Patent No. 6096,334 (the "'334 patent"); and (iii) U.S. Patent No. 6,361,790 (the "'790 patent") (collectively with the '263 and the '510 patents, "the Rolf Patents," named for one of the inventors).  These three patents all expire on March 30, 2014, and cover methods of formulating a medicinal adhesive patch.[2]  Other than the '510 patent, none of the Rolf patents has been listed in the Orange Book with respect to Lidoderm.

**2.     Watson's ANDA**

70.     On or about January 14, 2010, Watson notified Teikoku that it had filed ANDA No. 20-675, seeking to market a generic version of Lidoderm.  Watson's notice letter included a Paragraph IV certification that the commercial manufacture, use and/or sale of its generic Lidoderm product would not infringe any claim of the '529 patent, and/or that the '529 patent was invalid and/or unenforceable.

71.     Watson made no certification to any of the Rolf patents because, as of January 2010, the Rolf patents were not listed in the Orange Book.

---

[2] http://www.faqs.org/sec-filings/110513/LECTEC-CORP-MN-_8-K/c17154exv10w01.htm

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

### 3. Endo's Citizen Petition

72.     In December 2006, Endo submitted a citizen petition to FDA challenging an October 2006 FDA letter setting forth FDA's recommended methodology for demonstrating bioequivalence to Lidoderm.

73.     Endo subsequently amended its petition in August 2007 and March 2012.

74.     On August 23, 2012, FDA denied Endo's petition and approved Watson's ANDA.

### B.     Endo and Teikoku File Baseless Litigation Over The '529 Patent Against Watson

75.     On February 19, 2010, Endo and Teikoku filed suit against Watson in the United States District Court for the District of Delaware pursuant to Hatch-Waxman, alleging that Watson's generic Lidoderm product would infringe the '529 patent (the "'529 Lawsuit").  As a result of the filing of the '529 Lawsuit, the 30-month stay applied to Watson's ANDA, precluding FDA from approving Watson's ANDA until July 2012.

76.     The '529 Lawsuit was objectively baseless, and no reasonable litigant would, or could, have believed it could succeed on the merits, for various independent reasons.  First, the '529 patent is invalid as anticipated and/or obvious in view of numerous pieces of prior art, which were not disclosed to the PTO, and Endo and Teikoku knew it.  Second, the '529 patent did not cover Lidoderm, and Endo and Teikoku knew that Watson's generic Lidoderm would not infringe the '529 patent.

### 1.     The '529 Patent Is Invalid as Obvious

77.     The '529 patent, titled "External Preparation for Application to the Skin Containing Lidocaine," issued on October 27, 1998, from an application filed on June 10, 1994.  That application was a continuation of an application filed on March 30, 1992.

78.     The '529 patent claims foreign priority to Japanese Application No. 3-067353, filed March 30, 1991.

79.     The '529 patent contains six claims directed generally to a hydrogel transdermal patch containing the active ingredient lidocaine and inactive ingredients or excipients.

80.     Claim 1 of the '529 patent claims a patch comprising "a drug-retaining layer placed on a support," in which the drug-retaining layer comprises an "adhesive gel base and 1 to 10% by weight of lidocaine."   The claimed "adhesive gel base" consists of three components within specific percentage weight ranges:  (i) "0.5 to 50% by weight of a water-soluble high molecular weight substance"; (ii) "30 to 70% by weight of water"; and (iii) "1 to 70% by weight of a water-retaining agent."

81.     The same hydrogel transdermal patch technology claimed in the '529 patent was disclosed in several pieces of prior art which were not disclosed to the patent examiner.  Each of the following pieces of prior art discloses a hydrogel transdermal patch formulation substantially similar to that claimed in the '529 patent, except for the active pharmaceutical ingredient:

     a. Japanese Unexamined Patent Application Publication S63-51330, titled "Steroid-Containing External Adhesive Agent," issued to Teikoku Seiyaku on March 4, 1988;

     b. Japanese Unexamined Patent Application Publication S63-51333, titled "Deprodone Propionate-Containing External Adhesive Agent'" issued to Teikoku Seiyaku on March 4, 1988;

     c. European Patent Application Publication No. 0280737, titled "Steroidal Drug-Containing Preparation for External Use," filed on August 20, 1087 and published on September 7, 1988;

     d. Japanese Unexamined Patent Application Publication 63-104913, titled "Adhesive Patch for External Use," issued on May 10, 1988;

     e. Japanese Unexamined Patent Application Publication 63-238017, titled "Water-Based Adhesive Patch for External Use Containing Carteolol Hydrochloride," issued on October 4, 1988; and

     f. U.S. Patent No. 5,082,663, titled "External Adhesive Preparation Containing Steroids" issued on January 21, 1992 from U.S. Application No. 07/639,758, filed on January 11, 1991 (a continuation of U.S. Application No. 07/189,313, filed on April 20, 1988), which lists the 35 U.S.C. § 102(e) date as April 20, 1988.

Collectively, this prior art is referred to as the "Teikoku Prior Art."

82.     Each of these references qualifies as prior art to the '529 patent because it was publicly available and accessible more than one year before the March 30, 1991 priority date of the '529 patent.

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

83.   Each of the pieces of Teikoku Prior Art discloses an "adhesive gel base" consisting of (i) a water-soluble high molecular weight substance; (ii) water; and (iii) a water-retaining agent, all of which fall within the percentage ranges claimed in the '529 patent.

84.   Each of the pieces of Teikoku Prior Art discloses examples of the ingredients used in the adhesive gel base that are the same as those disclosed in the '529 patent.

85.   Each of the pieces of Teikoku Prior Art shares at least one inventor with the '529 patent. The prior art also shares the same applicant, prosecuting attorneys or assignee with the '529 patent. Thus, Teikoku was fully aware of the Teikoku Prior Art.

86.   During the prosecution of the '529 patent, the PTO rejected the patent five times noting that because lidocaine was conventionally used in transdermal patches, it would have been obvious to place lidocaine into available prior art patches.  Over several years, through each rejection, the PTO cited prior art patches other than the Teikoku Prior Art.  The applicants consistently distinguished the prior art patches cited by the Examiner, arguing that the patch in the '529 patent was "unique."  The applicants never disclosed the Teikoku Prior Art to the PTO, including Teikoku's own prior art patent on the same patch technology that was the subject of the '529 patent, which would have showed that the patch technology in the '529 patent was not unique, and in fact had been previously patented.  The Teikoku Prior Art was not cumulative of the prior art cited by the PTO, and the applicants would not have overcome the rejections if they had disclosed the Teikoku Prior Art to the PTO.

87.   Another item of invalidating prior art is U.S. Patent No. 4,695,465 (the "'465 patent"), which disclosed a patch with the same elements as the '529 patent, a water-soluble polymer, a water-retaining agent, and water, and also listed lidocaine as a drug substance that can be used in the patch in the same concentration range as disclosed in the '529 patent.   The applicants never disclosed the '465 patent to the PTO.  It was not cumulative of the prior art cited by the PTO, and the applicants would not have overcome the rejections if they had disclosed the '465 patent to the PTO.

88.   Each of the prior art references discussed above predates the priority date of the '529 patent by over a year, and thus invalidates the '529 patent.

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

### 2. The '529 Patent Does Not Cover Lidoderm and Is Not Infringed by Watson's Generic Lidoderm

89.     In addition to being invalid as obvious, the '529 patent did not cover Lidoderm and is not infringed by Watson's generic equivalent.   The patch formulation disclosed in the'529 patent includes a water soluble high molecular weight substance, water, and a water-retaining agent.  The water soluble high molecular weight substance and the water-retaining agent must be from the groups listed in the patent.  The groups listed in the '529 patent are known as Markush groups.  "A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C."  *Endo Pharm., Inc. et al., v. Watson Lab., Inc.*, slip op. at 1 n.1, No. 10-138 (GMS) (D. Del. June 27, 2011) (*quoting Abbott Labs. v. Baxter Pharm. Prods.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003)).

90.      In the '529 patent, the first Markush group related to "a water-soluble high molecular weight substance selected from the group consisting of gelatin, starch, agar, mannan, alginic acid, polyacrylic acid, a salt of polyacrylic acid, dextrin, methylcellulose, methylcellulose sodium, carboxymethylcellulose, carboxymethylcellulose sodium, polyvinyl alcohol, polyvinyl pyrrolidone, copolymer of methyl vinyl ether and maleic anhydride, gum arabic, tragacanth, karaya gum and locust bean gum."

91.     The second Markush group related to "a water-retaining agent selected from the group consisting of ethylene glycol, diethylene glycol, polyethylene glycol, glycerin, sorbitol, martitol, propylene glycol and 1,3-butylene glycol."

92.     As the District Court found in the Markman decision construing those two patent terms, Federal Circuit precedent from 2003 clearly established that both of the relevant Markush groups in the '529 patent were limited to one and only one of the listed alternatives.  *Endo Pharm., Inc. et al., v. Watson Lab., Inc.,* slip op. at 1 n.1 (quoting *Abbott Labs.,* 334 F.3d at 1280).   As the District Court held:

> [A]n indefinite article "a" or "an" in patent parlance carries the meaning of "one or more" in open-ended claims containing the transitional phrase "comprising." *Id.* at 1281. The Federal Circuit clarified, however, that "such an indefinite article used in conjunction with a Markush grouping does not receive such latitude because a proper Markush group is limited by the closed language term 'consisting of.' *Id.* Therefore, "although 'a'

20

without more generally could mean one or more in an open-ended patent claim, 'a' with 'consisting of' in this case indicates only one member of a Markush group." *Id.* Likewise, in this case, the plaintiffs are limited to "a" meaning "one and only one" water soluble high molecular weight substance.  During prosecution, the patentee chose to amend claim 1 by inserting a Markush group.

*Id.*

93.     The District Court applied the same reasoning to the second Markush group in the '529 patent as the issue was exactly the same for that group.  *Id.* at n.2.  Under Federal Circuit precedent, the patent must be interpreted to cover a product which contains only *one* of the substances from each of the two Markush groups.

94.     Both Lidoderm and Watson's generic contain at least *five* water-soluble high molecular weight substances, and *three* water-retaining agents.  Thus, they are outside the scope of the '529 patent. Given the clear Federal Circuit precedent, no other interpretation of the patent is objectively reasonable. As a result, the '529 patent does not cover Lidoderm, and is not infringed by Watson's generic.  No reasonable litigant would, or could, have believed that Watson's generic Lidoderm product infringed the '529 patent.

95.     As alleged extensively above, the '529 patent is invalid as obvious over prior art, including the Teikoku Prior Art, and Endo and Teikoku knew it.

96.     As alleged extensively above, the '529 patent does not cover Lidoderm or Watson's generic Lidoderm product, and Endo and Teikoku knew it.

97.     Despite knowing that the '529 patent is invalid and does not cover Lidoderm or its generic equivalents, Endo and Teikoku sued Watson for infringement of the '529 patent.  No reasonable litigant would have expected success on the merits of the litigation against Watson.  Endo and Teikoku commenced the litigation against Watson solely to delay generic competition to Lidoderm.

**C.      Teikoku Improperly Maintained the Listing of the '529 Patent in the Orange Book**

98.     Only those patents that cover the approved drug, or a method of using the drug may be listed in the Orange Book.  As alleged above, the '529 patent does not cover Lidoderm.  At least by July 2003, when the Federal Circuit issued the decision in *Abbott Labs. v. Baxter Pharm. Prods.*, 334 F.3d

21

1274, Teikoku knew, or had reason to know, that the '529 patent did not cover Lidoderm. As a result, the '529 patent did not meet the requirements for listing in the Orange Book because it did not claim Lidoderm or a method of use for Lidoderm. Endo and Teikoku also knew that by choosing to amend the patent claim to include a Markush group in an attempt to overcome the PTO's rejections, they were precluded from relying on the doctrine of equivalents to establish infringement.

99. In 2003, Teikoku was reviewing the '529 patent to update its status in the Orange Book. Teikoku subsequently submitted a correction to the FDA, changing the patent expiration date from June 10, 2011, which had been listed in the 2003 Orange Book, to October 27, 2015, which change appeared in the 2004 Orange Book. After reviewing the patent in 2003, instead of requesting that FDA change the expiration date of the '529 patent, Teikoku should have requested that the FDA delete its patent from the Orange Book. Because the '529 patent does not cover Lidoderm, Teikoku's maintenance of the listing of the '529 patent in the Orange Book was baseless. Additionally, because the '529 patent is invalid, and Teikoku knew it, Teikoku's listing of the '529 patent in the Orange Book was baseless.

100. No reasonable pharmaceutical company in Teikoku's position would realistically believe that the '529 patent should properly be listed in the Orange Book as related to Lidoderm or that the '529 patent could be reasonably asserted against an ANDA applicant for generic Lidoderm. Teikoku maintained the listing of the '529 patent in the Orange Book for the sole and improper purpose of delaying generic entry into the Lidoderm market.

101. Teikoku's continued listing of the '529 patent, despite knowing it does not cover Lidoderm, has caused Watson and other generics to make certifications under Paragraph IV as to the patent, and has resulted in the entry of 30-month stays in litigation with Watson and other generics, thereby delaying FDA approval of generic Lidoderm.

**D.      Endo, Teikoku and Watson Enter a "Pay for Delay" Agreement**

102. On or about May 28, 2012, Endo, Teikoku and Watson entered into an agreement ending the patent litigation related to Lidoderm between Endo, Teikoku and Watson.

103.    Under the Agreement, Watson Laboratories, Inc., on behalf of itself and its Affiliates, including its parent company, Watson Pharmaceuticals, Inc., agreed that it, and its Affiliates, would delay launching its generic Lidoderm product until September 15, 2013 unless otherwise specifically authorized by the Agreement.  Thus, Watson Pharmaceuticals, Inc. has also agreed through its wholly owned subsidiary, Watson Laboratories, Inc. to be bound by the terms and conditions of the Agreement.

104.    As the *quid pro quo* for Watson's promise to delay entry of its generic Lidoderm product until September 15, 2013, Endo and Teikoku promised to pay Watson at least $96 million in the form of branded Lidoderm at no cost to Watson in the amount of $12 million **per month** from January 1, 2013 through August 1, 2013.  Watson is free to sell the brand product and retain the full proceeds of those sales.  Additionally, Endo and Teikoku agreed to delay launching an authorized generic for 7.5 months following Watson's exclusive entry into the market.  Endo and Teikoku were otherwise ready, willing, and able to launch an authorized generic version of Lidoderm.  This latter promise had a cash value to Watson in the hundreds of millions of dollars.  Endo and Teikoku's agreement not to launch an authorized generic meant that Watson would be the sole generic on the market for at least 7.5 months, and could therefore maintain a relatively high generic price and earn higher profits than it otherwise would have earned, all at the expense of Plaintiff and other generic purchasers.

105.    The total payment flowing from Endo and Teikoku to Watson had a cash value in the hundreds of millions of dollars, and had no explanation or justification other than to induce Watson to stay out of the Lidoderm market and share monopoly profits among Defendants.  This large, unjustified reverse payment had no rational connection to, and far exceeds, any approximation of the costs of continuing the patent litigation.  The reverse payment was not consideration for the fair value of any services provided from Watson to Endo or Teikoku.

106.    Endo/Teikoku and Watson also knew and/or believed and intended that their Agreement would prevent other generic companies from launching their own generic Lidoderm before Watson did, thereby creating a bottleneck.  As the first filer of an ANDA for generic Lidoderm, Watson may be entitled to market its generic Lidoderm for 180 days free from competition from other generic Lidoderm

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

products.  The operation of the Agreement between Endo/Teikoku and Watson is designed to block all other generic Lidoderm products from coming to market until on or after September 15, 2013 because, absent the circumstances discussed above, FDA will not approve subsequently-filed ANDAs until Watson's exclusivity period has run, which will not occur until 180 days after Watson launches.

107.   Endo and Teikoku knew that the Agreement precluded entry of Watson's generic Lidoderm product despite the fact that Watson's generic Lidoderm product did not infringe the '529 patent, or any other patent Teikoku owned, and that the '529 patent is invalid.  Thus, the Agreement provided Endo and Teikoku with protection from competition that the '529 patent did not.

108.   Absent Endo and Teikoku's unlawful payments, any agreement settling the patent litigation would have resulted in much less delay of Watson's generic entry than with the payment, such that Watson would have launched much earlier than September 2013.

109.   Endo/Teikoku used the strength of its wallet as opposed to the strength of its patents to obtain the agreement of Watson not to launch its generic Lidoderm product.  In light of the fact that a ruling that the '529 patent was invalid or did not cover Lidoderm or a generic version of Lidoderm would have eliminated any reasonable possibility of keeping generic versions of Lidoderm from swiftly eradicating the vast majority of sales from Lidoderm—Endo/Teikoku agreed to share its monopoly rents with Watson as the *quid pro quo* for Watson's agreement not to compete with Endo/Teikoku in the lidocaine patch 5% market until September 15, 2013.

**E.   Anticompetitive Purpose and Effect of the Scheme**

110.   The overarching scheme alleged herein has enabled Defendants to: (a) delay and/or preclude the entry of less expensive generic versions of Lidoderm products in the United States; (b) delay and/or suppress the introduction of an authorized generic lidocaine patch 5%, which otherwise would have appeared on the market coincident with initial generic competition (and, at the latest, at a significantly earlier time than 7.5 months after Watson launches in September 2013); (c) fix, raise, maintain or stabilize the price of Lidoderm products; (d) permit Endo/Teikoku to maintain a monopoly

1  in the U.S. market for Lidoderm products; and (e) allocate 100% of the U.S. market for lidocaine patch
2  5% to Endo/Teikoku.

3        111.    But for the anticompetitive scheme, in whole or in part: (i) Watson would have received
4  FDA approval and begun selling its generic version of Lidoderm as early as May 2, 2012, when the
5  Hind patents expired; and (ii) an increasingly competitive market for lidocaine patch 5% would have
6  thereafter emerged as additional generic manufacturers entered the market. Watson would have
7  launched prior to resolution of any litigation over the Rolf patents as those patents afforded no
8  reasonable possibility of liability to Watson.  And, absent the illegal payment, assuming the '529
9  litigation was still filed, Endo, Teikoku and Watson would have entered an agreement under which
10 Watson would have entered the market much earlier than September 2013.

11
12           **1.**        **Watson Would Have Launched its Generic Lidoderm Upon FDA Approval
Notwithstanding the Rolf Patents.**

13       112.    On or about June 29, 2011, Endo filed another suit against Watson in the United States
14 District Court for the District of Delaware (*Endo Pharm. Inc. v. Watson Lab., et al.*, 11-cv-00575-GMS)
15 (the "Rolf patent litigation"), alleging that Watson's generic Lidoderm product would infringe three of
16 the Rolf patents, the '333 patent, the '334 patent, and the '510 patent.  Only the '510 patent was ever
17 listed in the Orange Book.

18       113.    The '510 patent was the only one of the three patents that previously had been asserted by
19 LecTec against Endo with respect to its Lidoderm product in the LecTec Litigation in 2008.

20       114.    And, as Endo and Teikoku learned from the LecTec Litigation, the '510 patent is invalid
21 as obvious in view of prior art references that were not before the PTO during the prosecution of the
22 '510 patent. The prior art renders the patent invalid as obvious.

23       115.    Watson was aware of the infirmities of the '510 patent from the publicly filed pleadings
24 in the LecTec Litigation.

25       116.    The '333 and '334 patents also afforded no reasonable infringement threat for Watson.
26 Indeed, LecTec had not even sued Endo for infringement of the '333 and '334 patents. When Endo

27
                                                  25
28

1   ultimately settled the LecTec Litigation in November 2009, it obtained licenses only to the '263 and

2   '510 patents.  At that time, neither LecTec nor Endo believed that licenses to the '333 and '334 patents

3   were relevant to the use, manufacture, or sale of Lidoderm.  Watson's patch similarly would not infringe

4   the '333 and '334 patents.

5        117.    Indeed, Endo did not obtain the rights to the '333 and '334 patents until May 2011, when

6   it bought the rights to all of the Rolf patents from LecTec for just $2 million.

7        118.    Nonetheless, shortly after obtaining the '333 and '334 patents, Endo asserted three of the

8   Rolf patents against Watson in a second lawsuit over Watson's generic Lidoderm product in June 2011.

9        119.    The Rolf patents were not listed in the Orange Book when Watson filed its ANDA.

10  Thus, Watson was not required to certify to those patents under Hatch-Waxman, and any litigation filed

11  over those patents would not, and could not, result in a 30 month stay of FDA approval of Watson's

12  ANDA.  Thus, the Rolf patent litigation was no impediment to approval of Watson's ANDA.  Once

13  Watson obtained FDA approval of its ANDA, it was free to launch.  Given the defects in the Rolf

14  patents, Watson would have launched upon final FDA approval even in the absence of a court ruling on

15  the Rolf patents as they carried no reasonable threat of imposing infringement liability on Watson.

16       **2.      Absent the Baseless Litigation Over the '529 Patent, Endo's Petition Would
            Not Have Delayed Watson's ANDA Approval**

17

18       120.    Watson received final FDA approval for its ANDA on August 23, 2012, the same day

19  that FDA denied Endo's citizen petition.

20       121.    Endo filed its petition and amendments solely to interfere with Watson's and other

21  generics' efforts to obtain FDA approval and not for any scientific or medical reasons.  Endo filed its

22  second amendment to the petition at the time that it did (March 2012) for the sole purpose of continuing

23  to delay FDA approval of Watson's and/or other generic manufacturers' ANDAs.

24       122.    Endo was able to wait until March 2012 to file its second amendment to the petition

25  because the 30-month stay of FDA approval of Watson's ANDA did not expire until July 2012, and

26  there was little risk that FDA would approve Watson's ANDA prior expiration of the stay.  Endo did not

27

28

cite or include anything in in the March 2012 amendment that it could not have submitted earlier. Because Endo's motivation was delay, if the '529 patent had not been listed in the Orange Book, and/or Endo and Teikoku had not filed baseless litigation against Watson, Endo would have submitted its 2012 amendment much earlier than it did, and FDA would have ruled on the petition earlier than it did.  As a result, FDA would have approved Watson's ANDA earlier to coincide with the expiration of the Hind patents on May 2, 2012.

123.    Endo's March 12, 2012 Amendment was strategically timed to have the maximum disruptive impact on generic approval.  By March 2012, the Lidoderm monopoly was in serious jeopardy.  The last of the Hind patents were expiring on May 2, 2012.  The trial on the '529 patent had concluded, and it had laid bare the lack of protection the '529 patent afforded Endo/Teikoku from generic competition.  And, the Rolf patents afforded no basis to delay approval of Watson's ANDA. There was a high probability that FDA would rule on Endo's petition either upon the end of the expiration of the Hind patents in May 2012 or the end of the 30 month stay of Watson's ANDA in July 2012.  Endo was also aware that Watson was telling Wall Street analysts in late 2011 and early 2012 that it was pursuing its ANDA based upon the 2006 FDA guidance, that it was closely monitoring the progress of the ANDA and expected approval in 2012, that its efforts to increase capacity were well underway, and it expected to be "ready to go at the earliest possible time to launch the product."[3]  Thus, the timing of Endo's filing of its 45 page Amendment in March 2012, with 14 separate requests for action by FDA, had nothing to do with any new scientific, medical, safety or efficacy information; instead, it was timed to maximize FDA delay in addressing Endo's issues and to delay approval of Watson's ANDA.

---

[3] http://seekingalpha.com/article/304091-watson-pharmaceuticals-ceo-discusses-q3-2011-results-earnings-call-transcript ; http://seekingalpha.com/article/304091-watson-pharmaceuticals-ceo-discusses-q3-2011-results-earnings-call-transcript; http://seekingalpha.com/article/365081-watson-pharmaceuticals-ceo-discusses-q4-2011-results-earnings-call-transcript

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

124.     The fact that Endo filed its petition and amendments solely to interfere with Watson's and other generics' effort to obtain FDA approval and not for any scientific or medical reasons was made clear in the Agreement with Watson.  In the Agreement, Endo and Teikoku promised not to submit any new filings to FDA "that would prevent, delay, or otherwise hinder Watson's ability to obtain FDA approval" for its generic.  Once Endo and Teikoku secured Watson's agreement not to enter the market until September 2013, the objective of delay had been achieved, and Endo and Teikoku no longer needed delay based upon Endo's petition.  If Endo's purpose was for anything other than delaying generic competition, it would not have agreed to such a provision.

125.     Given that delay of FDA approval for generic Lidoderm ANDAs was Endo's true goal, absent the 30-month stay, Endo would have filed the March 2012 Amendment much earlier to avoid the possibility that FDA would have approved Watson's ANDA in advance of the May 2, 2012 expiration of the unchallenged Hind patents.  Had Endo filed the Amendment earlier, FDA would have issued its August 23, 2012 decision earlier and would have approved Watson's ANDA earlier.  And Watson would have launched upon approval.

126.     Defendants' unlawful actions have delayed or prevented the sale of generic Lidoderm in the United States, and unlawfully enabled Endo/Teikoku to sell Lidoderm at artificially inflated, supracompetitive prices.  But for Defendants' illegal conduct, generic competition to Lidoderm would have occurred already because one or more generic manufacturer would have already entered the market with its generic version of Lidoderm.

## VIII.   INTERSTATE AND INTRASTATE COMMERCE

127.     At all material times, Endo/Teikoku manufactured, promoted, distributed, and sold substantial amounts of Lidoderm in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

128.     At all material times, Defendants transmitted funds as well as contracts, invoices and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Lidoderm.

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

129.    In furtherance of their efforts to monopolize and restrain competition in the market for lidocaine patch 5%, Defendants employed the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.  The activities of Defendants were within the flow of and have substantially affected interstate commerce.

130.    Defendants' anticompetitive conduct has substantial intrastate effects in that, *inter alia*, retailers within each state are foreclosed from offering less expensive generic Lidoderm to end-payors inside each respective state.  The foreclosure of generic Lidoderm directly impacts and disrupts commerce for end-payors within each state.

IX.    **MONOPOLY POWER AND MARKET DEFINITION**

131.    At all relevant times, Endo/Teikoku had monopoly power over lidocaine patch 5% because it had the power to maintain the price of the drug it sold as Lidoderm at supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Lidoderm, with the exception of AB-rated generic versions of Lidoderm.

132.    A small but significant, non-transitory price increase for Lidoderm by Endo/Teikoku would not have caused a significant loss of sales.

133.    Lidoderm does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of Lidoderm.

134.    Because of, among other reasons, its use and varying ability to treat pain associated with post-herpetic neuralgia, Lidoderm is differentiated from all products other than AB-rated generic versions of Lidoderm.

135.    Endo/Teikoku needed to control only Lidoderm and its AB-rated generic equivalents, and no other products, in order to maintain the price of Lidoderm profitably at supracompetitive prices.  Only the market entry of a competing, AB-rated generic version of Lidoderm would render Endo/Teikoku unable to profitably maintain its current prices of Lidoderm without losing substantial sales.

136.   Endo/Teikoku also sold Lidoderm at prices well in excess of marginal costs, and in excess of the competitive price, and enjoyed high profit margins.

137.   Endo/Teikoku have had, and exercised, the power to exclude and restrict competition to Lidoderm and AB-rated bioequivalents.

138.   Endo/Teikoku, at all relevant times, enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

139.   To the extent that Plaintiff is legally required to prove monopoly power circumstantially by first defining a relevant product market, Plaintiff alleges that the relevant market is lidocaine patch 5% (*i.e.*, Lidoderm and its AB-rated generic equivalents).   During the period relevant to this case, Endo/Teikoku has been able to profitably maintain the price of lidocaine patch 5% well above competitive levels.

140.   The relevant geographic market is the United States and its territories.

141.   At all relevant times, Endo/Teikoku's market share in the relevant market was and remains 100%, implying a substantial amount of monopoly power.

**X.   EFFECTS ON COMPETITION, AND THE DAMAGES CLAIMED IN THIS ACTION**

142.   Watson's ANDA was approved August 23, 2012.   Were it not for the anticompetitive scheme alleged herein, in whole or in part, one or more generic companies would have received FDA approval on or about May 2, 2012, and generic Lidoderm products would have entered the market on or shortly after that date.   In any event, one or more generic Lidoderm product would have entered the market at an earlier date than that provided in Defendants' Agreement, September 15, 2013.

143.   But for the anticompetitive scheme alleged herein, in whole or in part, an authorized generic version of Lidoderm would have been available on the market at an earlier time than 7.5 months after the launch of Watson's generic.

144.   Defendants' scheme has delayed generic competition and unlawfully enabled Endo/Teikoku to sell Lidoderm without generic competition.   But for Defendants' illegal conduct, one

30

1   or more generic competitors would have begun marketing AB-rated generic versions of Lidoderm by

2   May 2, 2012 or shortly thereafter.  In any event, one or more generic Lidoderm product would have

3   entered the market at an earlier date than that provided in Defendants' Agreement, September 15, 2013.

4         145.    The generic manufacturers seeking to sell generic Lidoderm had extensive experience in

5   the pharmaceutical industry, including in obtaining approval for ANDAs, marketing generic

6   pharmaceutical products, manufacturing commercial launch quantities adequate to meet market demand,

7   and, where appropriate, paying and receiving consideration for selective waiver and/or relinquishment of

8   180-day first-to-file marketing exclusivities.

9         146.    Defendants' scheme, which delayed introduction into the United States marketplace of

10  generic versions of Lidoderm, has caused Plaintiff and the Class to pay more than they would have paid

11  for lidocaine patch 5% absent Defendants' illegal conduct.

12        147.    Typically, generic versions of brand drugs are initially priced significantly below the

13  corresponding branded drug to which they are AB-rated.  As a result, upon generic entry, some or all of

14  the purchases of branded drugs are rapidly substituted for generic versions of the drug.  As more generic

15  manufacturers enter the market, prices for generic versions of a drug predictably plunge even further

16  because of competition among the generic manufacturers, and, correspondingly, the brand drug

17  continues to lose even more sales to the generics.

18        148.    This price competition enables all purchasers of the drugs to: (a) purchase generic

19  versions of a drug at a substantially lower price, and/or (b) purchase the brand drug at a reduced price.

20  Consequently, brand drug manufacturers have a keen financial interest in delaying the onset of generic

21  competition, and purchasers experience substantial cost inflation from that delay.

22        149.    But for Defendants' anticompetitive scheme, in whole or in part, end-payors, such as

23  Plaintiff and members of the Class, would have paid less for lidocaine patch 5% by (a) substituting

24  purchases of less-expensive AB-rated generic Lidoderm for their purchases of more-expensive branded

25  Lidoderm, (b) receiving discounts on their remaining branded Lidoderm purchases, and (c) purchasing

26  generic Lidoderm at lower prices sooner.

27

31

**CLASS ACTION COMPLAINT**
CASE NO.: 5:13-cv-5257

28

150.     Moreover, due to Defendants' anticompetitive scheme, other generic manufacturers were discouraged from and/or delayed in (a) developing generic versions of Lidoderm, and/or (b) challenging the validity or infringement of the Lidoderm patents in court.

151.     Thus, Defendants' unlawful conduct deprived Plaintiff and the Class of the benefits of competition that the antitrust laws were designed to ensure.

152.     During the relevant period, Plaintiff and other members of the Class purchased substantial amounts of Lidoderm indirectly from Endo/Teikoku and will purchase substantial amounts of generic Lidoderm indirectly from Watson.  As a result of Defendants' illegal conduct as alleged herein, Plaintiff and other members of the Class were compelled to pay, and did pay, artificially inflated prices for their lidocaine patch 5% requirements.   Plaintiff and the other Class members paid prices for lidocaine patch 5% that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (1) Class members were deprived of the opportunity to purchase lower-priced generic Lidoderm instead of more expensive brand-name Lidoderm; (2) Class members paid artificially inflated prices for lidocaine patch 5%.

153.     As a consequence, Plaintiff and other members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

**XI.     CLAIMS FOR RELIEF**

**CLAIM I: MONOPOLIZATION UNDER STATE LAW**
**(Asserted against Endo and Teikoku Defendants)**

154.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

155.     This claim is pled as to Endo, Teikoku Seiyaku and Teikoku Pharma.

156.     At all relevant times, Endo and Teikoku possessed substantial market power (*i.e.*, monopoly power) in the relevant market.  Endo and Teikoku possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

157. Through the overarching anticompetitive scheme, as alleged above, Endo and Teikoku willfully maintained their monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiff and the Class thereby.

158. It was Endo's and Teikoku's conscious objective to further their dominance in the relevant market by and through the overarching competitive scheme.

159. Endo and Teikoku's scheme harmed competition as aforesaid.

160. As a direct and proximate result of Endo and Teikoku's illegal and monopolistic conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

161. By engaging in the foregoing conduct, Endo and Teikoku have intentionally and wrongfully maintained monopoly power in the relevant market in violation of the following state laws:

a. Arizona Rev. Stat. §§ 44-1403, *et seq.*, with respect to purchases in Arizona by members of the Class.

b. Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and California common law with respect to purchases in California by members of the Class.

c. D.C. Code §§ 28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class.

d. Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Class.

e. 740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class.

f. Iowa Code § 553.5 *et seq.*, with respect to purchases in Iowa by members of the Class.

g. Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts end-payors paying substantially higher prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially within Massachusetts.

h. Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.*, with respect to purchases in Maine by members of the Class.

i. Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases in Michigan by members of the Class.

j. Minn. Stat. §§ 325D.52, *et seq.*, and Minn. Stat. § 8.31, *et seq.*, with respect to purchases in Minnesota by members of the Class.

k.  Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by members of the Class.

l.  Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases in Nebraska by members of the Class.

m.  Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases in Nevada by members of the Class.

n.  N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases in New Mexico by members of the Class.

o.  N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases in North Carolina by members of the Class.

p.  N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases in North Dakota by members of the Class.

q.  Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon by members of the Class.

r.  10 L.P.R.A. § 260, *et seq.*, with respect to purchases in Puerto Rico by members of the Class.

s.  R.I. Gen. Laws §§ 6-36-5 *et seq.*, with respect to purchases in Rhode Island by members of the Class.

t.  S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases in South Dakota by members of the Class.

u.  Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases in Utah by members of the Class.

v.  Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by members of the Class.

w.  W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases in West Virginia by members of the Class.

x.  Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Class.

## CLAIM II:  CONSPIRACY TO MONOPOLIZE UNDER STATE LAW
### (Asserted against Endo and Teikoku Defendants)

162.   Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

1    163.    This claim is pled as to Endo, Teikoku Seiyaku and Teikoku Pharma.

2    164.    With regard to all conduct complained of above, at all relevant times, Endo acted in

3    concert with Teikoku to maintain their monopoly power.

4    165.    At all relevant times, Endo and Teikoku possessed substantial market power (*i.e.*,

5    monopoly power) in the relevant market.  Endo and Teikoku possessed the power to control prices in,

6    prevent prices from falling in, and exclude competitors from the relevant market.

7    166.    Through the anticompetitive scheme alleged herein Endo and Teikoku conspired to

8    maintain Endo's monopoly power in the relevant market in order to block and delay market entry of

9    lidocaine patch 5%, *i.e.*, AB-rated generic versions of Lidoderm.  The scheme allocated all sales of

10   lidocaine patch 5% in the United States to Endo and Teikoku; delayed the sales of generic Lidoderm

11   products; and fixed the price at which Plaintiff and members of the Class would pay for lidocaine patch

12   5% at the higher, branded price.

13   167.    The goal, purpose and/or effect of the scheme was to maintain and extend Endo and

14   Teikoku's monopoly power in the United States market for lidocaine patch 5%. The scheme prevented

15   and/or delayed generic competition to Lidoderm and enabled Endo and Teikoku to continue charging

16   supracompetitive prices for Lidoderm without a substantial loss of sales.

17   168.    Endo and Teikoku knowingly and intentionally conspired to maintain and enhance Endo

18   and Teikoku's monopoly power in the relevant market.

19   169.    Endo and Teikoku specifically intended that their scheme would maintain Endo and

20   Teikoku's monopoly power in the relevant market, and injured Plaintiff and the Class thereby.

21   170.    Endo and Teikoku each committed at least one overt act in furtherance of the conspiracy.

22   171.    There is and was no legitimate, nonpretextual procompetitive justification for Endo and

23   Teikoku's actions comprising the anticompetitive scheme that outweighs their harmful effect.  Even if

24   there were some conceivable such justification, the scheme is and was broader than necessary to achieve

25   such a purpose.

26

27

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257
28

172.    As a direct and proximate result of Endo and Teikoku's concerted conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

173.    By engaging in the foregoing conduct, Endo and Teikoku intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of the following state laws:

a.  Arizona Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases in Arizona by members of the Class.

b.  Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Class.

c.  D.C. Code Ann. §§ 28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class.

d.  Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Class.

e.  740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class.

f.  Iowa Code § 553.3 *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Iowa by members of the Class.

g.  Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by members of the Class.

h.  Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts end-payors paying substantially higher prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially within Massachusetts.

i.  Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases in Maine by members of the Class.

j.  Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Class.

k.  Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases in Minnesota by members of the Class.

l.  Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by members of the Class.

m.  Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases in Nebraska by members of the Class.

36

n.  Nev. Rev. Stat. Ann. § 598A.060, *et seq.*, with respect to purchases in Nevada by members of the Class, in that thousands of sales of Lidoderm took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

o.  N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases in New Mexico by members of the Class.

p.  New York General Business Law § 340, *et seq.*, with respect to purchases in New York by members of the Class.

q.  N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases in North Carolina by members of the Class.

r.  N.D. Cent. Code § 51-08.1-02, *et seq.*, with respect to purchases in North Dakota by members of the Class.

s.  Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon by members of the Class.

t.  10 L.P.R.A. § 251, *et seq.*, with respect to purchases in Puerto Rico by members of the Class.

u.  R.I. Gen. Laws §§ 6-36-7 *et seq.*, with respect to purchases in Rhode Island by members of the Class.

v.  S.D. Codified Laws Ann. § 37-1-3.2, *et seq.*, with respect to purchases in South Dakota by members of the Class.

w.  Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases in Utah by members of the Class.

x.  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for Lidoderm and AB-rated generic equivalents at Tennessee pharmacies.

y.  Vt. Stat. Ann. 9, § 2453, *et seq.*, with respect to purchases in Vermont by members of the Class.

z.  W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Class.

aa. Wis. Stat. § 133.03, *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Wisconsin by members of the Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Lidoderm at Wisconsin pharmacies.

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

**CLAIM III:  CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW**
**(Asserted against All Defendants)**

174.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

175.    This claim is pled as to all Defendants.

176.    In or about May 2012 and at times prior to the formal execution thereof Defendants entered into the Agreement, a continuing illegal contract, combination and conspiracy in restraint of trade under which Endo and Teikoku agreed to pay Watson substantial consideration in exchange for Watson's agreement to delay bringing its generic version of Lidoderm to the market, the purpose and effect of which were to: (a) allocate 100% of the market for lidocaine patch 5% in the United States to Endo and Teikoku; (b) prevent the sale of generic versions of Lidoderm in the United States, thereby protecting Lidoderm from any generic competition for over a year; (c) delay the entry of an authorized generic by Endo and Teikoku until 7.5 months after Watson's entry with a generic Lidoderm product; (d) fix, at supracompetitive levels, the price at which end-payors would pay for lidocaine patch 5%; and (e) create a bottleneck to prevent FDA from approving any other ANDA for generic Lidoderm until after Watson's exclusivity period ends.

177.    The Agreement harmed Plaintiff and the Class as set forth above.

178.    The Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

179.    There is and was no legitimate, nonpretextual, procompetitive justification for the payment from Endo and Teikoku to Watson that outweighs its harmful effect.  Even if there were some conceivable such justification, the payment was not necessary to achieve such a purpose.

180.    As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

181.    By engaging in the foregoing conduct, Defendants entered a conspiracy and combination in restraint of trade in violation of the following state laws:

38

a. Arizona Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases in Arizona by members of the Class.

b. Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Class.

c. D.C. Code Ann. §§ 28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class.

d. Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Class.

e. 740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class.

f. Iowa Code § 553.3 *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Iowa by members of the Class.

g. Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by members of the Class.

h. Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts end-payors paying substantially higher prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially within Massachusetts.

i. Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases in Maine by members of the Class.

j. Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Class.

k. Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases in Minnesota by members of the Class.

l. Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by members of the Class.

m. Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases in Nebraska by members of the Class.

n. Nev. Rev. Stat. Ann. § 598A.060, *et seq.*, with respect to purchases in Nevada by members of the Class, in that thousands of sales of Lidoderm took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

o. N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases in New Mexico by members of the Class.

p. New York General Business Law § 340, *et seq.*, with respect to purchases in New York by members of the Class.

39

q. N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases in North Carolina by members of the Class.

r. N.D. Cent. Code § 51-08.1-02, *et seq.*, with respect to purchases in North Dakota by members of the Class.

s. Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon by members of the Class.

t. 10 L.P.R.A. § 251, *et seq.*, with respect to purchases in Puerto Rico by members of the Class.

u. R.I. Gen. Laws §§ 6-36-7 *et seq.*, with respect to purchases in Rhode Island by members of the Class.

v. S.D. Codified Laws Ann. § 37-1-3.2, *et seq.*, with respect to purchases in South Dakota by members of the Class.

w. Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases in Utah by members of the Class.

x. Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for Lidoderm and AB-rated generic equivalents at Tennessee pharmacies.

y. Vt. Stat. Ann. 9, § 2453, *et seq.*, with respect to purchases in Vermont by members of the Class.

z. W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Class.

aa. Wis. Stat. § 133.03, *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Wisconsin by members of the Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Lidoderm at Wisconsin pharmacies.

**CLAIM IV:  ATTEMPTED MONOPOLIZATION UNDER STATE LAW**
**(Asserted against Endo and Teikoku Defendants)**

182.   Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

183.   This claim is pled as to Endo, Teikoku Seiyaku and Teikoku Pharma.

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

184.   Endo and Teikoku, through their overarching anticompetitive scheme, specifically intended to maintain monopoly power in the relevant market.  It was Endo's and Teikoku's conscious objective to control prices and/or exclude competition in the relevant market.

185.   The natural and probable consequence of Endo and Teikoku's overarching anticompetitive scheme, which was intended by, and plainly foreseeable to, Endo and Teikoku, was to control prices and exclude competition in the relevant market, to the extent it did not succeed.

186.   There was a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that Endo and Teikoku would succeed in and achieve their goal of maintaining monopoly power in the relevant market.

187.   As a direct and proximate result of Endo and Teikoku's illegal and monopolistic conduct, Plaintiff and the Class were harmed as aforesaid.

188.   By engaging in the foregoing conduct, Endo and Teikoku have intentionally and wrongfully attempted to monopolize the relevant market in violation of the following state laws:

      a.   Arizona Rev. Stat. §§ 44-1403, *et seq.*, with respect to purchases in Arizona by members of the Class.

      b.   Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and California common law with respect to purchases in California by members of the Class.

      c.   D.C. Code §§ 28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class.

      d.   Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Class.

      e.   740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class.

      f.   Iowa Code § 553.5 *et seq.*, with respect to purchases in Iowa by members of the Class.

      g.   Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts end-payors paying substantially higher prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially within Massachusetts.

      h.   Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.*, with respect to purchases in Maine by members of the Class.

i. Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases in Michigan by members of the Class.

j. Minn. Stat. §§ 325D.52, *et seq.*, and Minn. Stat. § 8.31, *et seq.*, with respect to purchases in Minnesota by members of the Class.

k. Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by members of the Class.

l. Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases in Nebraska by members of the Class.

m. Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases in Nevada by members of the Class.

n. N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases in New Mexico by members of the Class.

o. N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases in North Carolina by members of the Class.

p. N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases in North Dakota by members of the Class.

q. Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon by members of the Class.

r. 10 L.P.R.A. § 260, *et seq.*, with respect to purchases in Puerto Rico by members of the Class.

s. R.I. Gen. Laws §§ 6-36-5 *et seq.*, with respect to purchases in Rhode Island by members of the Class.

t. S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases in South Dakota by members of the Class.

u. Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases in Utah by members of the Class.

v. Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by members of the Class.

w. W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases in West Virginia by members of the Class.

x. Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Class.

## CLAIM V:  UNJUST ENRICHMENT
### (Asserted against All Defendants)

189.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

190.    Defendants have benefited from the overcharges on their sales of Lidoderm resulting from the unlawful and inequitable acts alleged in this Complaint.

191.    Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Lidoderm by Plaintiff and members of the Class.

192.    Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Class.

193.    It would be futile for Plaintiff and the Class to seek a remedy from any party with whom they had privity of contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiff and the Class.

194.    It would be futile for Plaintiff and the Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Lidoderm, because those intermediaries are not liable and would not compensate Plaintiff and the Class for Defendants' unlawful conduct or the harm caused to Plaintiff and the Class by that unlawful conduct.

195.    The economic benefit that Defendants derived by charging supracompetitive and artificially inflated prices for Lidoderm is a direct and proximate result of Defendants' unlawful practices.

196.    The financial benefits that Defendants derived rightfully belong to Plaintiff and the Class, because Plaintiff and the Class paid anticompetitive prices during the Class Period, inuring to the benefit of Defendants.

197.    It would be inequitable under unjust enrichment principles under the laws of each of the States in the United States and the District of Columbia and Puerto Rico for the Defendants to be

43

1  permitted to retain any of the overcharges for Lidoderm derived from Defendants' unfair and

2  unconscionable methods, acts, and trade practices alleged in this Complaint.

3      198.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and

4  the Class.

5      199.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff

6  and the Class all unlawful or inequitable proceeds received by Defendants.

7      200.    A constructive trust should be imposed upon all unlawful or inequitable sums received by

8  Defendants traceable to Plaintiff and the Class.

9      201.    Plaintiff and the Class have no adequate remedy at law.

10  **CLAIM VI:  DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE**
    **CLAYTON ACT FOR DEFENDANTS' VIOLATIONS OF SECTION 1 AND SECTION 2 OF**
11  **THE SHERMAN ACT**
    **(Asserted against All Defendants)**
12

13      202.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding

14  paragraph as though fully set forth herein.

15      203.    Plaintiff's allegations described herein and in the preceding Counts comprise violations

16  of Sections 1 and 2 of the Sherman Act, in addition to the state laws *supra*.

17      204.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a) hereby

18  seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described

19  herein violates Sections 1 and 2 of the Sherman Act.

20      205.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16

21  of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market

22  effects caused by Defendants' unlawful conduct, and other relief so as to assure that similar

23  anticompetitive conduct does not reoccur in the future.

24  **XII.**    **DEMAND FOR JUDGMENT**

25      WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully request that the Court:

26

27                          44

28

A.   Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declare the Plaintiff as the representative of the Class;

B.   Declare that the conduct alleged herein is in violation of the statutes set forth above;

C.   Enjoin Defendants from continuing the illegal activities alleged herein and grant other equitable and injunctive relief as necessary to mitigate or prevent future anticompetitive effects of Defendants' conduct;

D.   Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

E.   Award the Class damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

F.   Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment; and

G.   Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law.

## XIII.   **JURY DEMAND**

Pursuant to Fed. Civ. P. 38, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

DATED: November 12, 2013

Respectfully submitted,

**GIRARD GIBBS LLP**

By: _____

Daniel C. Girard (SBN: 114826)

45

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257

1   Dena C. Sharp (SBN: 245869)
    Scott M. Grzenczyk (SBN: 279309)
2   **GIRARD GIBBS LLP**
    601 California Street, 14th Floor
3   San Francisco, CA 94108
    Telephone: (415) 981-4800
4   Facsimile:  (415) 981-4846
    Email: dcg@girardgibbs.com
5   Email: chc@girardgibbs.com
    Email: smg@girardgibbs.com
6

7   Natalie Finkelman Bennett
    James C. Shah
8   Eric L. Young
    SHEPHERD, FINKELMAN, MILLER
9   & SHAH, LLP
    35 East State Street
10  Media, PA 19063
    Telephone: (610) 891-9880
11  Facsimile:  (610) 891-9883
    Email: nfinkelman@sfmslaw.com
12  Email: jshah@sfmslaw.com
13

14  Rose F. Luzon
    SHEPHERD, FINKELMAN, MILLER
15  & SHAH, LLP
    401 West A Street, Suite 2350
16  San Diego, California 92101
    Telephone: (619) 235-2416
17  Email: rluzon@sfmslaw.com

18

19  Steve D. Shadowen
    HILLIARD & SHADOWEN LLC
20  39 West Main Street
    Mechanicsburg, Pennsylvania 17055
21  Telephone: (855) 344-3298
    Email: steve@hilliardshadowenlaw.com
22

23  Anne K. Fornecker
    HILLIARD & SHADOWEN LLC
24  919 Congress Ave. Suite 1325
    Austin, Texas 78701
25  Telephone: (855) 344-3298
    Email: anne@hilliardshadowenlaw.com
26

27
28

1

2

*Counsel for Plaintiff United Food and
Commercial Workers Local 1776 &
Participating Employers Health and Welfare Fund*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
CASE NO.: 5:13-cv-5257